IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| S.I.A.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, Commissioner of Social Security | : | |
| | : | NO. 25-3023 |

**MEMORANDUM AND ORDER**

CAROLINE GOLDNER CINQUANTO, U.S.M.J. August 31, 2026

Plaintiff filed this appeal from the Commissioner's decision denying her application for disability insurance benefits ("DIB"). For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and affirm the Commissioner's decision.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on November 28, 2022. Tr. at 74, 200. She alleged disability beginning on August 18, 2022, as a result of post-traumatic stress disorder ("PTSD"), post-partum depression, anxiety, agoraphobia, nerve damage in the back, chronic shoulder pain, and chronic pain in the hips. Id. at 200, 224.[2] Her

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using her initials. See Standing Order – In re: Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]In order to be eligible for DIB, Plaintiff must establish that she became disabled prior to the expiration of her insured status or date last insured ("DLI"). 20 C.F.R. § 404.131(b). Here, the ALJ found and no one disputes that Plaintiff's DLI is December 31, 2026. Tr. at 19.

application was denied initially on June 14, 2023, id. at 103-04, and on reconsideration on August 30, 2023. Id. at 109-10.

On August 31, 2023, Plaintiff requested an administrative hearing. Tr. at 113-14. After holding a hearing on February 14, 2024, id. at 51-73, the ALJ issued an unfavorable decision on June 13, 2024. Id. at 17-31. The Appeals Council denied Plaintiff's request for review on April 8, 2025, id. at 1-3, making the ALJ's June 13, 2024 decision the final decision of the Commissioner. 20 C.F.R. § 404.981.

Plaintiff sought review in federal court on June 12, 2025, Doc. 1, and the matter is now fully briefed. Docs. 10-12. The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 6.

## II. LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1. Whether the claimant is currently engaged in substantial gainful activity;
>
> 2. If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3. If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
> 5. If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. § 404.1520(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at

the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III. DISCUSSION

### A. ALJ's Findings and Plaintiff's Claims

In his June 13, 2024 decision, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 18, 2022. Tr. at 20. At step two, the ALJ found that Plaintiff had the following severe impairments: anxiety disorder, depressive disorder, lumbar spine hemangioma,[3] chronic posttraumatic stress/strain of the lumbar spine with complaints of low back pain and right-sided sciatica, status post-motor vehicle accident, and obesity. Id. at 20. At the third step, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." Id. The ALJ found that Plaintiff had the RFC to perform light work except (1) she must be allowed to alternate sitting and standing positions at 20-minute intervals throughout the workday, (2) can **frequently** push or pull with the right hand; use foot controls with the right foot; climb ramps, stairs, ladders, ropes, and scaffolds; kneel crouch, and crawl; reach in all directions, including overhead with the right upper extremity; and use moving mechanical parts, and (3) can understand, remember, and carry out simple tasks with

[3]A hemangioma is a common type of vascular malformation consisting of blood vessels. Dorland's Illustrated Medical Dictionary, 33rd ed. (2020), at 821.

**occasional** changes in the work setting, interaction with the public and coworkers, and over the shoulder supervision. Id. at 24-25.

At the fourth step, the ALJ found that Plaintiff is not able to perform her past relevant work as a home attendant, nurse assistant, and companion. Tr. at 29, 58-59, 67-68. Based on the Plaintiff's age, education, work experience, and RFC, a vocational expert ("VE") testified that Plaintiff could perform the jobs of bench assembler, inspector, and packer. Id. at 30; see also id. at 68-70 (VE's testimony). As a result, the ALJ concluded that Plaintiff was not disabled. Id. at 31.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to (1) properly acknowledge Plaintiff's diagnosis of PTSD and the related limiting effects, (2) properly evaluate the relevant Listing, (3) include the PTSD-related effects in the RFC assessment and hypothetical posed to the VE, and (4) impermissibly applied the "sit and squirm" test. Doc. 10-1. Defendant responds that substantial evidence supports the ALJ's evaluation of Plaintiff's mental impairments, including PTSD, and properly considered Plaintiff's behavior at the hearing and her participation in group therapy in evaluating Plaintiff's impairments. Doc. 11. Plaintiff has filed a reply. Doc. 12.[4]

---

[4]Because Plaintiff's challenge to the ALJ's decision is primarily focused on the ALJ's consideration of PTSD and the limitations related to her mental health impairments, I will focus my review of the testimony and medical evidence on the relevant testimony/evidence.

### B. Plaintiff's Claimed Limitations and Testimony at the Hearing

Plaintiff was born on April 1, 1987. Tr. at 57, 200. She completed the eleventh grade. Id. at 57. She has past relevant work as a home attendant, nurse assistant, and companion. Id. at 58-59, 67-68. She lives with her four children[5] and their father. Id. at 57. Plaintiff was 35 years old when she alleges she became disabled on August 18, 2022, and 37 years old at the time of the ALJ's June 13, 2024 decision. Id. at 57, 200.

At the hearing, Plaintiff testified as follows. She stopped working in August 2022 when she "just became too overwhelmed with everything [and ] felt like [she] just shut down." Tr. at 60. Plaintiff injured her back and right shoulder in car accidents that occurred in 2018 and 2022.[6] Id. at 61. She has pain that radiates from her back, down her right leg and into her foot. Id. The pain in her shoulder is aggravated by activity and is "an aching and tight pain" that causes her right hand to give out and shake. Id. She also has difficulty raising her right arm overhead. Id. Medications sometimes help with the pain but make Plaintiff drowsy. Id. at 62.

Plaintiff does not like large crowds, is terrified on a daily basis, and has ringing in her ears. Tr. at 62. Plaintiff attributes her PTSD to witnessing two attempted murders and the release of someone against whom she testified. Id. at 64. She leaves the house

---

[5]Plaintiff's youngest child was born on November 6, 2022. Tr. at 60. Plaintiff's other children were 12-15 years old at the time her youngest was born. Id. at 738.

[6]The treatment records also indicate that there was an intervening car accident, which occurred on September 13, 2021. Tr. at 828.

only twice a month and never alone. Id. at 64, 66. Her PTSD causes a heavy feeling, throbbing in her head, and a feeling that she just shuts down. Id. at 62.

A VE also testified at the administrative hearing. Tr. at 67-72. The VE characterized Plaintiff's jobs as a home attendant and nurse assistant as semiskilled medium level jobs, but the exertional level could change based on the patients' weight. Id. at 67-68.[7] The companion job is semiskilled and light. Id. at 68. The ALJ asked the VE to consider someone of Plaintiff's age, education, and background, who could perform light work, with the other limitations contained in the ALJ's RFC assessment, see supra at 4. Id. at 69. The VE testified that such an individual could not perform Plaintiff's past relevant work. Id. However, such an individual could perform the jobs of bench assembler, packer, and inspector. Id. at 69-70. When asked the effect leaving the house twice a month had on the occupational base, the VE testified that such a limitation would be work-preclusive. Id. at 71. Similarly, if the person were off-task 15% of the day, there would be no work available. Id. Based on the VE's testimony, the ALJ found that Plaintiff was not disabled. Id. at 31.

[7]The VE characterized the jobs using their specific vocational preparation ("SVP") time, the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." See https://occupationalinfo.org/appendxc_1.html (last visited Aug. 5, 2026). Unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9. Social Security Ruling ("SSR") 00-4p, Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions," 2000 WL 1898704, at *3 (Dec. 4, 2000).

### C. Medical Records

#### 1. Physical Impairments

##### a. Treatment Providers

Plaintiff has a history of right leg pain beginning after a motor vehicle accident in February 2018, for which she takes gabapentin[8] which "helps sometimes." Tr. at 513. She had a second accident on September 13, 2021, for which she sought treatment for neck, back, and right shoulder pain. Tr. at 828. Plaintiff began treatment with Jon S. Rock, D.C., of Rock Chiropractic Rehabilitation Center on October 25, 2021. Id. Dr. Rock diagnosed Plaintiff with post traumatic sprain/strain complex of the cervical, thoracic, and lumbar spine and myalgia and myofasciitis. Id. at 829. After seeing Plaintiff two or three times a week until March 1, 2022, Dr. Rock concluded that Plaintiff had "reached a point of maximal improvement from conservative chiropractic treatment." Id. at 830. Dr. Rock's prognosis was guarded based on the "longevity and continuance of the symptoms." Id.

On July 8, 2022, when Plaintiff was 23 weeks pregnant, she reported to Emilie Melvin, M.D., in her obstetrician's office, that she had back pain following another motor vehicle accident that "took her side mirror off, but did not impact the driver's side door." Tr. at 495. According to Dr. Melvin, Plaintiff reported "lower back pain located on the left side that began shortly after the event and ha[d] slowly worsened since that time." Id.

[8]Gabapentin is used to treat nerve pain, partial seizures, and restless leg syndrome. See https://www.drugs.com/gabapentin.html (last visited Aug. 5, 2026).

Dr. Melvin recommended Tylenol and heat packs, and the doctor noted that Plaintiff's "back pain has improved with Tylenol." Id. at 500. On October 7, 2022, Eileen Wang, M.D., Plaintiff's obstetrician, noted Plaintiff's complaints of back pain, described as "longstanding but exacerbated by pregnancy." Id. at 479.

On April 17, 2023, Plaintiff was seen by David Yaron, M.D., at Mercy Eastwick Primary Care, to reestablish care for anxiety/depression, gestational diabetes, and chronic low back pain with sciatica. Tr. at 887-929. Dr. Yaron noted that Plaintiff was followed by the office for over two years for weight management and behavioral modifications. Id. at 892. Dr. Yaron indicated that Plaintiff's chronic low back pain had improved since pregnancy, and he prescribed baclofen,[9] which had been discontinued due to pregnancy. Id. at 893, 897. He also diagnosed Plaintiff with obstructive sleep apnea, for which she was following up at the University of Pennsylvania, id. at 893; impaired fasting glucose and gestational diabetes, for which he ordered bloodwork,[10] id. at 896; adjustment disorder, for which Plaintiff had an intake scheduled for psychiatric services on May 18, 2023, id.; morbid obesity, for which he prescribed Wegovy,[11] id. at 897; and

[9]Baclofen is a muscle relaxant. See https://www.drugs.com/baclofen.html (last visited Aug. 4, 2026).

[10]A subsequent note indicated that the gestational diabetes had resolved. Tr. at 899.

[11]Wegovy is used for weight loss, long-term weight management, and to reduce the risk of major cardiovascular events. See https://www.drugs.com/wegovy.html (last visited Aug. 4, 2026).

gastroesophageal reflux disease ("GERD"), for which he prescribed pantoprazole.[12] Id. at 897.

On July 12, 2023, Plaintiff saw Dr. Yaron complaining of right ankle pain and back pain radiating to her legs. Tr. at 930. Dr. Yaron continued baclofen and ordered x-rays of Plaintiff's right ankle. Id. at 940. On April 26, 2024, Vijay Choudhry, M.D., from Mercy Eastwick completed a form for the Philadelphia County Assistance Office indicating that Plaintiff was disabled as of September 1, 2022, as a result of major depressive disorder ("MDD"), general anxiety disorder ("GAD"), PTSD, chronic back pain with right leg involvement, and morbid obesity. Id. at 884-85.

b. Consultants & State Agency Physicians

Monique Slade, N.P., conducted an Internal Medicine Examination on March 8, 2023. Tr. at 383-87. Nurse Practitioner Slade ("NP Slade") noted that Plaintiff's gait and stance were normal and her squat was 50%. Id. at 385. She had reduced strength (4/5) in the right lower extremity. Id. at 386. Plaintiff's hand and finger dexterity were intact and she had full grip strength. Id. Based on her examination, NP Shade found Plaintiff could frequently lift and carry up to 20 pounds, and occasionally lift and carry from 21-50 pounds. Id. at 388. Plaintiff could sit for a total of 6-7 hours in 20-minute increments and stand and walk for 6-7 hours a day in 15-minute increments. Id. at 389. NP Shade found that Plaintiff could frequently reach and push/pull with her right hand and had no

[12]Pantoprazole is used to decrease the amount of acid produced in the stomach. It is used to treat GERD. See https://www.drugs.com/pantoprazole.html (last visited Aug. 5, 2026).

limitations in the use of her left hand. Id. at 390. Similarly, Plaintiff could frequently use her right foot to operate foot controls and had no limitation in the use of her left foot. Id.

On June 2, 2023, at the initial consideration stage, based upon his review of the record, Jonathan W. Bortz, M.D., found there was no evidence of a medically determinable impairment. Tr. at 77. On reconsideration, on August 25, 2023, Roman Oleh Bilynsky, M.D., found from his review of the record, that Plaintiff did not suffer from any severe medically determinatble impairment. Id. at 87.

2 Mental Impairments

a. Treatment Providers

On January 13, 2023, Plaintiff reported to Pennsylvania Hospital's Perinatal Mood Disorders program that she was "having trouble sleeping and is very anxious about violence in Philadelphia." Tr. at 739. Madeleine Ireland, who conducted the intake interview, referred Plaintiff to mental health professionals. Id. at 740. On June 7, 2023, Steven Gordon, M.D., of Community Council Health Systems, conducted an intake interview with Plaintiff, during which Plaintiff reported a history of anxiety and depression. Id. at 765-68. Plaintiff stated that she felt depressed most of the time and felt "stressed out at times due to social stressors." Id. at 765. She reported sleep issues due to racing thoughts and stated that her primary care physician "restarted Lexapro in April 2023." Id.[13] Plaintiff reported nightmares caused by an incident when she "witness[ed] a

[13]Lexapro (generic escitalopram) is an antidepressant. See https://www.drugs.com/search.php?searchterm=lexapro (last visited Aug. 4, 2026).

home invasion and her partner being shot 4 times." Id. Dr. Gordon noted that Plaintiff startles easily and endorsed avoidant behaviors. Id.[14] However, her mental status exam ("MSE") was normal. Id. at 766-67. Dr. Gordon's diagnoses were MDD, recurrent episode, mild, and PTSD. Id. at 761-62. Dr. Gordon increased Plaintiff's Lexapro and recommended therapy. Id. at 767.

On June 15, 2023, Dr. Gordon noted that Plaintiff was feeling anxious because her daughter had been "jumped" coming home from school. Tr. at 762. The doctor added Atarax[15] to Plaintiff's medication regimen. Id. at 763. The following week, Dr. Gordon noted that Plaintiff was sleeping better on hydroxyzine, feeling better, functioning well, and found benefit from her medication regimen without side effects. Id. at 758. On June 29, 2023, Plaintiff reported that "things are going well" with improved sleep and decreases in her anxiety and depression. Id. at 754. Dr. Gordon noted a normal MSE. Id. Plaintiff complained of "breakthrough anxiety in social settings," for which Dr. Gordon recommended taking additional hydroxyzine. Id. On July 27, 2023, Dr. Gordon noted Plaintiff was stable on her medication but she complained of flashbacks and nightmares related to a prior traumatic event. Id. at 749. Dr. Gordon prescribed prazosin[16] to address the flashbacks and nightmares. Id. at 749.

---

[14]At that time, Plaintiff reported intermittent varying pain in her back and leg, but was pain free during the interview. Tr. at 766.

[15]Atarax (generic hydroxyzine) is a sedative used to treat anxiety and tension. See https://www.drugs.com/atarax.html (last visited Aug. 4, 2026).

[16]Prazosin is used to treat hypertension. See https://www.drugs.com/mtm/prazosin.html (last visited Aug. 4, 2026).

On August 24, 2023, Plaintiff reported that her medications were helpful in managing her mood, anxiety, and depression and reported improvement in her nightmares since starting prazosin. Tr. at 797. On July 11, 2023, Dr. Gordon completed a form for the Pennsylvania Department of Human Services, indicating that Plaintiff was permanently disabled as a result of MDD, GAD, and PTSD. Id. at 438, 744, 886. On November 22, 2023, Dr. Gordon noted a normal MSE, and indicated that Plaintiff was stable on Lexapro for her anxiety and depression, getting restful sleep with hydroxyzine, and improved nightmares with prazosin. Id. at 792. On December 7, 2023, in developing Plaintiff's Recovery Goal Plan, Charles Hill, M.S., indicated that Plaintiff was suffering from a "constant feeling of fear [and] does not leave her home." Id. at 787. On MSE, Mr. Hill noted that Plaintiff was suffering paranoid ideation related to violence she had witnessed in the past. Id. at 786-87.

b. Consultants & State Agency Physicians

Martha DiPrinzo, M.A., conducted a Mental Status Evaluation on March 8, 2023. Tr. at 371-75. The only abnormalities Ms. DiPrinzo noted on examination were that Plaintiff's attention, concentration, and recent and remote memory skills were mildly impaired. Id. at 373. Ms. DiPrinzo diagnosed Plaintiff with unspecified depressive disorder, unspecified anxiety disorder, and PTSD. Id. at 374. Ms. DiPrinzo noted that Plaintiff would be able to manage her own funds. Id. In a Medical Source Statement, Ms. DiPrinzo opined that Plaintiff had mild limitation in the abilities to understand,

remember, and carry out simple instructions and make judgments on simple work-related decisions. Ms. DiPrinzo found Plaintiff had moderate limitation in the abilities to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions. Id. at 376. She also found Plaintiff had moderate limitation in the abilities to interact with the public, co-workers, and supervisors and respond appropriately to usual work situations and changes in a routine work setting. Id. at 377.

On June 13, 2023, at the initial consideration stage, John Robert Vigna, Psy.D., found from his review of the record that Plaintiff suffered from depressive, bipolar, and related disorders; anxiety and obsessive-compulsive disorders, and trauma and stressor related disorder. Tr. at 79.[17] Dr. Vigna found Plaintiff had no understanding and memory limitations and no limitations in sustained concentration and persistence. Id. at 80. He found Plaintiff had some moderate limitations in interaction and adaptation. Id. Dr. Vigna concluded that Plaintiff "is able to perform simple, routine tasks in a stable environment." Id. at 81.

Based on her review of the records on August 25, 2023, at the reconsideration stage, Valorie Lynn Rings, Psy.D., concurred in Dr. Vigna's findings that Plaintiff had no limitations in understanding and memory or sustained concentration and persistence. Tr.

[17]The ALJ mistakenly attributes these opinions to Dr. Bortz, who conducted the medical portion of the records review. Tr. at 28. Dr. Vigna actually completed the mental RFC section of the Disability Determination Explanation at the Initial consideration stage. See id. at 79.

at 90. Likewise, she found Plaintiff had some moderate limitations in social interaction and adaptation, and found she "is able to perform simple, routine tasks in a stable environment. Id. at 91.

**D. Claims**

1. PTSD

Several of Plaintiff's claims focus on the ALJ's failure to properly consider Plaintiff's diagnosis and symptoms related to PTSD. Dr. Gordon first diagnosed Plaintiff with PTSD on June 7, 2023. Tr. at 765; see also id. at 744 (7/11/23 - PTSD diagnosis noted on disability form by Dr. Gordon). The ALJ did not include PTSD in considering which of Plaintiff's medically determinable impairments were severe at step two, see tr. at 20, and did not consider Listing 12.15, applicable to the evaluation of PTSD, at step three. Id. at 20-24. Plaintiff argues that the ALJ's decision is not supported by substantial evidence because it is unclear if or to what degree the ALJ considered the limitations related to Plaintiff's PTSD in considering the Listings and Plaintiff's RFC. Doc. 10-1 at 8-9. Defendant responds that "[s]ubstantial [e]evidence [s]upports the ALJ's [e]evaluation of Plaintiff's [m]ental [i]mpairments [i]ncluding PTSD [w]here [h]e [d]iscussed [h]er [t]rauma-[r]elated [s]ymptoms, [a]nxiety, and [m]ood and [a]ccounted for [t]hem in the . . . RFC . . . [assessment]." Doc. 11 at 4.

Before addressing the Listings, I note that the failure to find a specific impairment severe at Step Two, in and of itself, is considered harmless if the ALJ determines that another impairment is severe and proceeds to the latter steps of the sequential evaluation. See Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 144-45 & n.2 (3d Cir. 2007)

("because the ALJ found in [the claimant's] favor at Step Two, even if he had erroneously concluded that some of her impairments were non-severe, any error was harmless."); see also 20 C.F.R. § 404.1523(c) ("[W]e will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately would be of sufficient severity."). Here, the ALJ found several of Plaintiff's conditions were severe and proceeded beyond the second step of the sequential evaluation. Thus, the failure to find PTSD severe is harmless.

At step three, the ALJ did not consider Listing 12.15, applicable to the consideration of PTSD. However, the ALJ considered whether Plaintiff's mental health impairments met or equaled Listings 12.04, governing the consideration of depressive and bipolar disorder, and 12.06, governing anxiety and obsessive-compulsive disorders. Tr. at 23-24.[18] In doing so, the ALJ considered the same "B criteria" applicable in Listing 12.15, requiring extreme limitation of one, or marked limitation in two of the areas of mental functioning: (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself. Compare 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(B) and 12.06(B), with id. § 12.15(B). Because the ALJ determined that

[18]Each of the relevant Listings contains an "A criteria," which "includes the medical criteria that must be present" to meet the Listing, the "B criteria," which "provides the functional criteria we assess . . . to evaluate how your mental disorder limits your functioning," and the "C criteria," which requires "your mental disorder [to] be 'serious and persistent." 20 C.F.R. Pt. 404, Subpt. P, App., 1 § 12.00(A)(2). The "A criteria" are Listing-specific. The "B criteria" and "C criteria" are identical for the three relevant Listings.

Plaintiff had, at most, moderate limitations in two of the areas of functioning, he found that Plaintiff did not meet the "B criteria." Id. at 23-24. Defendant argues that the ALJ's consideration of the "B criteria" with respect to the other Lisings is dispositive of Listing 12.15. Doc. 11 at 6-7.

Plaintiff contends that this argument – that the ALJ considered the same B criteria for other Listings – is not compelling because the "A criteria" of each of the Listings is different and there is no evidence that the ALJ reviewed the "B criteria" "with the PTSD diagnosis in mind." Doc. 10-1 at 10. I reject Plaintiff's first contention. Although the "A criteria" are different, each of the relevant listings requires that Plaintiff meet either the "A criteria" and the "B criteria" or the "A criteria" and the "C criteria." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06, 12.15. Plaintiff makes no argument that she meets the "C criteria," requiring that the impairment be "serious and persistent," i.e., lasting at least 2 years and result in a "minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." Id. §§ 12.04(C), 12.06(C), 12.15(C). Because Plaintiff admits that she "was diagnosed as early as 2023" with PTSD, and the ALJ's decision is dated June 13, 2024, she cannot meet the two-year requirement to meet the "C criteria." Thus, proper consideration of the "B criteria" would be determinative of Listing 12.15, as well.

Plaintiff's second contention -- that the ALJ failed to consider Plaintiff's PTSD symptoms in evaluating the "B criteria" -- requires careful consideration of the ALJ's decision. Plaintiff argues that because the ALJ did not address Listing 12.15 and did "not reflect any of [Plaintiff's] possible symptoms of PTSD in his discussion" of the "B

criteria" "it is impossible to know how the ALJ factored the functional problems of PTSD into his determination of whether [Plaintiff] met the "B" criteria of the mental health listings." Doc. 10-1 at 8-9. Defendant responds that, when the opinion is read as a whole, the ALJ properly considered Plaintiff's symptoms in analyzing the "B criteria" of the Listings. Doc. 11 at 6-7.

First, I note that the ALJ did not ignore the PTSD diagnosis. The ALJ acknowledged Plaintiff's treatment for agoraphobia and PTSD. Tr. at 25. He also noted her symptoms related to PTSD and their cause.

> [Plaintiff] does not like being around large crowds. She is terrified on a daily basis, and is afraid to send her baby to daycare. [Plaintiff] sometimes shuts down, or gets ringing in her ears. Sometimes, she gets a heavy feeling with a throbbing in her head, and just shuts down. [Plaintiff] estimated she leaves her house only twice a month. She is fearful, particularly because she has witnessed two attempted murders, and testified against one of the perpetrators, who is now out of prison. [Plaintiff] only leaves the house when accompanied by her significant other, or her mother, who is a retired police officer.

Id. at 25-26. Although this discussion was contained in the RFC section of the ALJ's decision, the Third Circuit has instructed that an ALJ's decision is to be read "as a whole." Fullen v. Comm'r of Soc. Sec., 704 F. App'x 121, 124 (3d Cir. 2017) (citing Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004)). Thus, it is clear that the ALJ considered Plaintiff's PTSD and its symptoms.

Moreover, when addressing the "B criteria," the ALJ discussed symptoms related to Plaintiff's PTSD, albeit without mentioning PTSD. For example, in concluding that Plaintiff had a moderate limitation in her ability to interact with others, the ALJ noted

that Plaintiff "testified that she never leaves the house alone." Tr. at 23. Likewise, in finding Plaintiff had a moderate limitation in adapting or managing oneself, the ALJ noted that Plaintiff "has significant difficulty leaving her home, . . . moving around the community independently," and has nightmares. Id. at 24. Thus, it is inaccurate to say the ALJ ignored Plaintiff's PTSD symptoms in evaluating the "B criteria."

In addition, in discussing the "B criteria," the ALJ cited to treatment records that included the PTSD diagnosis in which the medical provider's assessment of Plaintiff's mental status supported the ALJ's assessment of limitation. For example, in finding Plaintiff had a mild limitation in understanding, remembering, or applying information, the ALJ cited to, among other records, an MSE completed by Erica Johnson, R.N., tr. at 23 (citing id. at 749), in which Nurse Johnson noted Plaintiff's report of a traumatic event a few years prior that resulted in "flashbacks and nightmares where [Plaintiff] wakes up terrified." Id. at 749. Despite these symptoms, Nurse Johnson noted Plaintiff had "[g]ood" remote, recent, and immediate memory. Id. Similarly, the ALJ cited to Dr Gordon's June 7, 2023 treatment note, when the doctor first documented Plaintiff's PTSD symptoms. Id. at 23 (citing id. at 766). Despite Plaintiff's PTSD symptoms, see id. at 765 (witnessed home invasion when partner shot 4 times, nightmares, avoidance behaviors, startles easily), Dr. Gordon found Plaintiff had "[g]ood" cognition and memory and relates well with others, id. at 766, supporting the ALJ's finding of moderate interaction limitation and mild limitation in understanding, remembering, or applying information. Id. at 23.

In sum, although the ALJ did not specifically mention PTSD by name in considering the Listings, he considered the limitations imposed by PTSD and his assessment is supported by the contemporaneous MSE findings noted by Plaintiff's mental health providers. Any error in failing to mention PTSD by name was harmless.

To the extent Plaintiff argues that the ALJ did not properly consider her PTSD diagnosis and symptoms in crafting her RFC assessment, I reject the argument. Unlike consideration of the Listings, where the ALJ neglected to mention PTSD, as previously noted, in discussing Plaintiff's RFC, the ALJ acknowledged Plaintiff's PTSD, its causes and symptoms. Tr. at 27. The limitations the ALJ included in his RFC assessment are supported by the MSE findings by her mental health providers, the assessment made by the consultative examiner, and the conclusions of the State agency physicians who reviewed Plaintiff's records.[19]

---

[19]Plaintiff's claim that the ALJ failed to develop the record and resolve ambiguities in the record regarding Plaintiff's PTSD is a repackaging of the claim that the ALJ did not properly consider the limiting effects of her PTSD in evaluating her claim.

> As discussed above the ALJ found that [Plaintiff] has a moderate limitation in interacting with others and in adapting or managing oneself. R.23-24. If the ALJ had evaluated the Plaintiff's problems with PTSD, there would have been thorough discussion of these symptoms and the functional limitations associated with PTSD; it would allow for these findings to be analyzed further. The ALJ's failure to fully develop the record and resolve ambiguities in the record does not allow for meaningful; review of [Plaintiff's] file in any future proceedings.

Doc. 10-1 at 12. Plaintiff has not identified any basis for further development of the mental health treatment record. The treatment notes containing the PTSD diagnosis and related symptomatology are contained in the record. As explained, although the ALJ did not parse out the limitations attributable to PTSD, he clearly considered such limitations

2. Sit and Squirm

Plaintiff also claims the ALJ impermissibly employed the "sit and squirm" test when he observed that "the claimant behaved in a socially appropriate fashion during the hearing," Doc. 10-1 at 13 (quoting tr. at 23), and noted that Plaintiff's "ability to behave properly in doctor's appointments and in groups at therapy . . . was further evidence of her ability to work." Id. at 15 (citing tr. at 23). Defendant responds that the ALJ "was entitled to rely upon his hearing observations as *one* factor in his analysis." Doc. 11 at 7.

"The 'sit and squirm' method is employed when an ALJ expects a claimant to behave a certain way at the hearing and if the claimant fails to manifest the behaviors, the claim is denied" and is generally impermissible. Pleacher v. Colvin, Civ. No. 13-2756, 2015 WL 1470662, at *10 (M.D. Pa. Mar. 31, 2015) (quoting Pfingstler v. Colvin, Civ. No. 13-84, 2014 WL 811796, at *3 (W.D. Pa. Mar. 3, 2014) (in turn citing Van Horn v. Schweiker, 717 F.2d 871 (3d Cir. 1983)). If, however, the ALJ's observation is one of many factors considered by the ALJ and supported by other evidence in the record, courts in this circuit have found no error. See Zavattaro v. Saul, Civ. No. 18-3362, 2020 WL 6797138, at *15 (D.N.J. Nov. 19, 2020) (no error when observation of Plaintiff was "one of a number of factors that the ALJ took into account in crafting of the RFC determination") (citing Holley v. Colvin, 975 F. Supp.2d 467, 480-81 (D.N.J. 2013), aff'd sub nom Holley v. Comm'r of Soc. Sec, 590 F. App'x 167 (3d Cir. 2014) (finding no error in the ALJ's consideration of plaintiff's ability to sit through a 65-minute hearing

---

and his assessment was consistent with the limitations found by Plaintiff's mental health providers.

where the ALJ's observations did not serve as the "sole basis" for his assessment); Bokor v. Comm'r of Soc. Sec., Civ. No. 10-5880, 2012 WL 254130, at *10 (D.N.J. Jan. 27, 2012), aff'd, 508 F. App'x 186 (3d Cir. 2012) (finding ALJ provided clear and satisfactory explanation of the basis for RFC when "he adequately justified his decision to give little credence to the 'conclusory statements' contained [in a medical opinion] by stating that they were not corroborated by the clinical evidence of record and were inconsistent with his personal observations of Plaintiff at the hearing").

Here, when considering Plaintiff's ability to interact with others for purposes of the "B criteria" of the Listings, the ALJ noted that Plaintiff "behaved in a socially appropriate fashion during the hearing." Tr. at 23. If this were the ALJ's sole basis for his findings, Plaintiff's argument would be justified. However, the ALJ reviewed Plaintiff's testimony, daily activities evidencing her ability to get along with her significant other and their four children, as well as the findings of the consultative examiner and her treatment providers, who found Plaintiff pleasant, cooperative, and engaging. Id. These findings by the ALJ are consistent with the record. See, e.g., id. at 373 (consultative examiner DiPrinzo described Plaintiff as cooperative and found her manner of relating to be adequate), 749 (Nurse Johnson found Plaintiff "pleasant, engaging and cooperative"), 766 (Dr. Gordon described Plaintiff as cooperative and noted she relates well). The ALJ's observation was merely consistent with the evidence upon which he relied. Thus, I find no error.

3. Hypothetical Question

Finally, Plaintiff complains that the ALJ failed to include all of Plaintiff's functional limitations in questioning the VE. Doc. 10-1 at 17-18. Specifically, Plaintiff complains that the ALJ failed to incorporate functional limitations related to Plaintiff's PTSD because the ALJ failed to properly evaluate her PTSD, and failed to incorporate any limitations to account for the mild limitation in concentration, persistence, and pace. Id. Defendant responds that the ALJ properly questioned the VE, regarding Plaintiff's credibly established limitations. Doc. 11 at 8-9.

In order for a VE's testimony to constitute substantial evidence, the hypothetical question posed must consider all of the claimant's impairments which are supported by the record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (citing, inter alia, Podedworny v. Harris, 745 F.2d 210 (3d Cir. 1984)). "Hypotheticals are considered deficient when important factors are omitted or the claimant's limitations are not adequately portrayed." Emery v. Astrue, Civ. No. 07-2482, 2008 WL 5272454, at *3 (E.D. Pa. Dec. 18, 2008) (citing Podedworny, 745 F.2d at 218).

As previously discussed, I found the ALJ properly considered the evidence of Plaintiff's PTSD in crafting the RFC assessment. The ALJ considered Plaintiff's testimony, the notes of her treating mental health providers, the consultative examiner, and the State agency physicians, and the ALJ's RFC assessment is supported by the record evidence. Thus, I find no error in the hypothetical in this respect.

Plaintiff also complains that the ALJ failed to include in the hypothetical any limitation to address Plaintiff's mild limitations in concentration, persistence, or pace,

when questioning the VE. Doc. 11 at 8; Doc. 12 at 8. As previously discussed, in considering the mental health Listings at the third step of the sequential evaluation, the ALJ found Plaintiff suffered from "mild" limitation in concentrating, persisting, or maintaining pace. Tr. at 24. Plaintiff contends that the ALJ failed to account for this mild limitation in questioning the VE.

The Third Circuit has explained the relationship between the "B criteria" of the mental health Listings at the third step of the sequential evaluation and the RFC assessment done at the fourth step.

> [N]o incantations are required at steps four and five simply because a particular finding has been made at steps two and three. Those portions of the disability analysis serve distinct purposes and may be expressed in different ways. When mental health is at issue, the functional limitation categories are "used to rate the severity of mental impairment(s)[.]" SSR 96-8p, 1996 WL 374184, at *4 (Jul. 2, 1996). While obviously related to the limitation findings, the RFC is a determination of "the most [a claimant] can still do despite her limitations" "based on all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1), . . . ; SSR 96-8p, at *2. It "requires a more detailed assessment [of the areas of functional limitation] by itemizing various functions contained in the broad [functional limitation] categories[,]" such as by describing the claimant's "abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." Id. at *6. In short, the findings at steps two and three will not necessarily translate to the language used at steps four and five.

Hess v. Comm'r of Soc. Sec., 931 F.3d 198, 209 (3d Cir. 2019). Thus, the ALJ's failure to include limitations related to mental impairments found mild at steps two and three does not necessarily result in error at step four. See Brumfield v. Saul, Civ. No. 19-4555,

2020 WL 4934315, at *8 (E.D. Pa. Aug. 21, 2020) (affirming where ALJ found mild limitations in "B criteria" at step two and RFC assessment did not include limitations related to non-severe mental impairments).

Here, contrary to Plaintiff's assertion, the ALJ included a limitation to address Plaintiff's mild limitation in concentration, persistence, and pace. Specifically, the ALJ included a limitation that the hypothetical person "[w]ould be able to understand, remember, and carry out simple tasks with only occasional changes in the work setting." Tr. at 69. In Hess, the Third Circuit found that a limitation to "simple tasks" was sufficient to address a "moderate" limitation in concentration persistence and pace, as long as the ALJ provided a valid explanation for the limitation in the RFC assessment. 931 F.3d at 211. As previously discussed, the ALJ's RFC assessment is supported by substantial evidence, including the MSEs conducted by her mental health providers, the consultative examiner's findings, and those of the State agency physicians who reviewed Plaintiff's records.

## IV. CONCLUSION

The ALJ's decision is supported by substantial evidence. Although the ALJ failed to consider Listing 12.15, related to PTSD, the error is harmless. It is clear that the ALJ considered Plaintiff's PTSD diagnosis and symptoms in considering the "B criteria" of the other relevant mental health Listings, and in determining Plaintiff's RFC. The ALJ did not employ "sit and squirm" jurisprudence in considering Plaintiff's demeanor at the hearing where the ALJ adequately discussed the evidence and his observations were not the sole basis for his decision. The hypothetical posed to the VE was not flawed and the

ALJ adequately addressed the mild limitation in concentration, persistence, and pace when he limited Plaintiff to "simple tasks with only occasional changes in the work setting." Tr. at 69.

An appropriate Order follows.